[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff, the Commissioner of Environmental Protection ("DEP"), brings this enforcement action against D.H. Williams, Inc. and Douglas Williams for alleged pollution to the waters of the state from the defendant's construction activities conducted at 33 Moosehorn Road, Granby, Connecticut. On or about August 23, 2000 "DEP" issued a Cease and Desist Order and on or about October 26, 2000 Douglas Williams for the corporate defendant signed a Consent Order. Although the owner of the parcel in question is the corporate defendant and the individual defendant describes himself as the agent of the corporate defendant who did all the construction activity in question, the court will refer to both defendants throughout this memorandum as "Williams." "DEP" is seeking injunctive relief pursuant to Conn. Gen. Stat. § 22a-6 and assessment of civil penalties.
The evidence produced that "Williams," beginning in 1977, began to clear some of the 66-acre parcel with a cut of a 15-foot swath from the end of Moosehorn Road towards the top of the very steep slope for a driveway after receiving a permit for such from the Town of Avon. The driveway was constructed in a gradual ascension across the slope so as not to exceed a 15% grade with a C-shaped curl at the top of the slope. During the construction of the driveway near the Moosehorn Road cul-de-sac, the adjoining landowner, Roy Champagne, brought suit claiming trespass, quiet title and injunctive relief in September 1999 which suit was decided in "Williams's" favor on December 4, 2001. "Williams" claimed that the contested area was where, because it was the lowest area of the parcel, he intended to have a detention pond for the storm water run-off.
Because of the nature of the slope of the parcel, run-off is directed in one of two ways. The most westerly part of the parcel is directed southerly towards Route 20 and the west branch of Salmon Brook. On the other hand most of the slope of the parcel lies on the easterly portion of the parcel and is directed easterly to intermittent water courses and CT Page 2524 then onto Moosehorn Brook. In the spring of 2000 "Williams" in preparation of a home on the top of the slope cleared additional land north of the driveway for an intended orchard. After over five (5) inches of rain fell, produced by two rain storms in the first week of June 2000, there was considerable run-off carrying sediment from the newly disturbed areas of the parcel down into the intermittent water courses and eventually to the water plain of Moosehorn Brook. As a result of an inspection by "DEP," a Cease and Desist Order (see Plaintiff's Exhibits 9and 10) was issued to "Williams" dated August 23, 2000. Plaintiff'sExhibit 18 and Defendant's Exhibit S.
"Williams" engaged in extensive work to remediate the slope where it had been disturbed and set up detention basins. In a walk on-site on June 16, 2000 with Doug Williams with his engineer, Nat Sreenath and soil scientist, Peter J. Levesque, Pioneer Environmental, Inc., two reports were generated indicating erosion controls were in place although some were failing but that large amounts of sediment had been deposited in the wetlands along Moosehorn Brook causing discharge in the brook.Plaintiff's Exhibits 9 and 10. The reports made by "DEP" employees, Julie Kiritsis and Brian Golembiewski. In August of 2000, apparently at the request of Julie Kiritsis, Donald Mysling, Senior Fisheries Biologist, generated two reports (Plaintiff's Exhibits 35 and 37) concerning his field reviews of the west bank of Moosehorn Brook on August 7, 8 and 18. He concludes that the construction activity on the Williams property at 33 Moosehorn Road has deposited sediment along the west bank for 315 feet to depths of 6 to 20 inches; that it has overtopped the brook completely eliminating all physical instream habitat within this segment of the brook. He claimed that he only found trout and aquatic insects upstream. Although he suggests that a sediment profile be conducted, none is ever conducted by him or anyone else. "Williams's" civil engineer, who had previously prepared a proposed site plan for the driveway with erosion control (Defendant's Exhibit P), after the June 2000 run-off, prepared a preliminary plan in progress (Plaintiff's Exhibit 2) which "Williams" presented to the "DEP" on November 16, 2000 which was turned down. SeePlaintiff's Exhibits 29, 30 and 31. On November 20, 2000 "Williams" previously on October 6, 2000 paid $500 to "DEP" for a storm water permit. See Defendant's Exhibit Q.
In March 2002, Donald Mysling was again asked to review the condition of Moosehorn Brook. Plaintiff's Exhibit 39. He stated therein that sediment has continued to flow from the "Williams" property into Moosehorn Brook and is overtopping the stream bed.
Stephen Gephard, a fisheries biologist, testified that he was familiar with Moosehorn Brook when the State received money from the federal CT Page 2525 government to start an Atlantic Salmon Reclamation Program in Connecticut in 1981 and had walked Moosehorn Brook which he chose as one of the tributary streams in the Farmington River Basin for the program. It was free flowing with an eight (8) foot drop per mile with clean cool water and a riparian tree cover and cobble stream bed making it an excellent stream to stock with Atlantic Salmon fry in the spring. He stocked it with fourteen hundred (1,400) fry in 1983 and 1984 but has not been back to the stream until 2002 since 1990. He found that the west bank of the stream had extensive pockets of sediment and the stream appeared to be without fish or aquatic insects.
Christopher Stone, a "DEP" employee who replaced Julie Kiritsis when she left "DEP," testified that his inspection in 2002 showed a foot of sediment and an overtopping of the stream bed.
Neither Mysling, who had requested a sediment profile in August of 2000 nor Stone or Gephard could say when or how the depth of sediment occurred on this segment of the west bank of the Moosehorn Brook except that there is presently sediment arriving from the intermittent water course and from the bank of the brook.
Two neighbors, who own property on the west bank of the Moosehorn Brook, testified that they have seen no changes in the brook which they have walked consistently since before 1996. Blake Gibson purchased twelve (12) acres on the west bank with six (6) to seven (7) hundred feet on the bank in 1996. He is upstream from his parent's home which is on the east bank of the brook and he had lived with them three (3) years before 1996. He testified that there was more silt in 1995 than there is today. At the time that he had seen two (2) trucks removing silt from the brook upstream a few hundred feet from the water courses where there was a cut in the bank. Richard Granstand testified that he had purchased five (5) acres adjoining Gibson on the west bank downstream of Gibson across from Gibson's parents. He had walked the brook often since 1995 before his purchase of the property in 1996. He saw no changes in the silt nor the brook from 1995. He was familiar with the two dams and recalled that from time to time someone removes the weir board to allow more water to flow when the stream is high and recalls helping Gibson cut a tree from one of the dams after it had fallen on it. Both testified that there were fish in the brook then and now but not many.
The court on October 16, 2002 viewed the "Williams" parcel with the respective parties and their attorneys. From the most northerly part of the parcel there is a view of the Hartford skyline twenty (20) miles away and a particularly good view of the Heublein tower on Avon mountain. We walked down the unfinished driveway which was cut first southerly and CT Page 2526 then easterly. To the north of the driveway there was an area that had obviously been cleared which was a several hundred foot sided rectangle. It obviously had been covered in reclamation. There were several silt fences and swales with several detention ponds. As we went easterly I saw some several hundred feet towards the northeast a cut in the forest line as if someone had attempted to make a roadway up the mountain slope. It appeared to be a cut of several hundred feet. At or about the Moosehorn Road cul-de-sac we picked up the intermittent water course which we followed down close to one mile to Moosehorn Brook. The drop in terrain was very steep and I was amazed as the amount of water grew ever greater and noisier in our descent despite the fact that this was October 2002, the year Connecticut suffered in winter, spring, summer and fall the worst drought in years. On our way down we were forced to go northeast because of the topography and I noted that there was another water course parallel and some few hundred feet northeast of the one we followed. At the brook I noted the water was rapid and plentiful. We walked along south downstream on the west bank to Moosehorn Road overpass some five hundred (500) feet. The water was passing through the two dams. To my untrained eye the water appeared clear with a rocky bottom. There were pockets of what appeared white earthen material. I took no measurements as to its depth. I saw no fish.
Finally in June 2002 "Williams" made a submission towards reclamation that apparently was acceptable to "DEP" and was workable. See Plaintiff'sExhibit 32. Both "DEP" and "Williams" produced evidence that these twenty-eight (28) photographs for reclamation are still in controversy as to whether completed. Christopher Stone used the photographs from Pioneer Environmental, Inc. to illustrate what was still to be done by showing what each reclamation area presently looks like. See Plaintiff's Exhibit54. On the other hand "Williams" produced comparison photographs then and now. See Defendant's Exhibits H, I, J, K, L and M. Both methods are effective. The court can see that "Williams" had substantially stabilized its soil erosion and provided substantial rip-rap to the water course channel which had not been previously there.
Since it is necessary to prevent a second occurrence the court must enjoin "Williams" from any further construction activities without a Storm Water Pollution Control Plan being submitted for the "DEP's" review and written approval that meets all of the requirements of Section 6(b) (6) of the construction general permit as required by the consent order. This shall not prohibit "Williams" from engaging in construction activities required by the consent order.
The court finds that "Williams's" conduct was unintentional in violating the requirements of Conn. Gen. Stat. § 22a-430b, done with CT Page 2527 the aid of professional advice, having no economic benefit, that the scope of the activities was for a simple residential purpose of one with limited or no assets, whose reclamation efforts would apparently exceed any damage unleased by it. See Conn. Gen. Stat. § 22a-438. The consent order acknowledges that "Williams" discharged sediment as a pollutant into the waters of the state. The evidence does not demonstrate that "Williams's" construction activities was the cause of the amount of silt found in the Moosehorn Brook or the surrounding wetlands nor the damage to the channel of the water course as claimed by "DEP." Using the factors set out in Conn. Gen. Stat. § 22a-438 the court imposes a total penalty of Five Hundred Dollars ($500).
The court therefore enjoins "Williams" from any further construction activities as set out in this memorandum until such time as the "DEP" gives it written approval of a Storm Water Pollution Control Plan under penalty of One Thousand Dollars ($1,000) and imposes on "Williams" a total penalty of Five Hundred Dollars ($500) upon its admission of a violation of Conn. Gen. Stat. § 22a-430b.
BY THE COURT
 Thomas H. Corrigan Judge Trial Referee
CT Page 2528